**LOWERY v. ZORN et al.**

No. 4950.

Court of Appeal of Louisiana. Second Circuit.

Dec. 5, 1934.

H. B. Lingle and Harry V. Booth, both of Shreveport, for plaintiff-appellant.

E. W. & P. N. Browne and Hoye Grafton, all of Shreveport, for defendant-appellant.

W. B. Massey, of Shreveport, and C. B. Fuller, of Andalusia, Ala., for appellee.

MILLS, Judge.

Christopher C. Lowery, a resident of DeSoto parish, La., acting individually and in behalf of his two minor sons, Quinton and Julius, brings, in the district court for the parish of Bossier, this suit against J. J. Zorn, doing business as the J. J. Zorn Gin & Warehouse Company, domiciled in, and a citizen of, the state of Alabama; the Maryland Casualty Company, alleged to be a foreign corporation qualified to do business in this state; and W. C. Talley, a resident of Bossier parish.

Petitioner alleges that on or about December 8, 1933, he engaged Zorn to transfer him, his two minor sons, as paying passengers, and his household effects from Hacada, Ala., to a farm in DeSoto parish, La.; that on or about December 20, while en route, the Chevrolet truck belonging to Zorn and being driven by his agent, E. P. Williams, collided with a car being driven by W. C. Talley, causing the injuries sued for. He alleges that Zorn's driver was negligent in that, when approaching the Bossier end of the Texas Street bridge over Red river, at Shreveport, he heedlessly drove into an intersection against a red traffic light, colliding at the center of the intersection with the car driven by Talley, who is also alleged to have been negligent in that he failed to apply his brakes or to take the proper steps to avoid the collision after he saw, or should have seen, that the Zorn truck was not going to stop; that the Maryland Casualty Company is liable as the insurer of Zorn.

The petition is first met by an application on the part of Zorn and his insurer for removal to the United States District Court for the Western District of Louisiana, on the ground of diversity of citizenship. The usual jurisdictional averments are made, together with the following: That Talley, the resident defendant, is not a necessary party to the suit;

that in a previous action brought on the same cause, and upon due application removed to the above designated federal court, Talley was not made a party defendant, but, on the contrary, was exonerated from all blame, sole responsibility being charged to Zorn; that plaintiff has made statements to the same effect; that when the present suit was brought Talley was insolvent to the knowledge of plaintiff, and movers solvent; that Talley is joined herein solely for the purpose of preventing removal, and not in good faith; that after the service of this petition plaintiff filed in the federal court a motion to dismiss the original suit; that in the present suit no cause of action is alleged as to Talley.

An exception that the petition for removal failed to state a cause or right of action was never passed upon. The issuance of this order for removal was resisted, and refused by the trial judge. Defendants, on appeal, insist that the refusal to grant the order was erroneous and that the cause should now be removed as prayed for.

The only ground urged in the petition for removal is diversity of citizenship. It is conceded that all other requirements are complied with in the application and that there is such diversity between plaintiff and the two defendants seeking removal, but plaintiff contends that Talley, the third defendant, is correctly alleged to be a citizen of Louisiana. This is not denied by defendants seeking removal, nor do they contend that the case is removable unless facts are shown that, on their face, are sufficient to support the allegation that Talley was made a party without any legal ground therefor, in bad faith, and solely for the purpose of defeating removal.

■ It is well settled that state courts have the right to determine whether or not a petition for removal to a federal court, on its face, shows a legal right to same. If such showing is made, the state court cannot try the issue and determine the truth or falsity of the allegations, but must grant the removal. Chesapeake & Ohio R. Co. v. Cockrell, 232 U. S. 146, 34 S. Ct. 278, 280, 58 L. Ed. 544.

■ This same case well states the rule in cases such as that presented here, as follows:

"A civil case, at law or in equity, presenting a controversy between citizens of different states, and involving the requisite jurisdictional amount, is one which may be removed by the defendant, if not a resident of the state in which the case is brought; and

this right of removal cannot be defeated by a fraudulent joinder of a resident defendant having no real connection with the controversy. [Citing cases.] So, when in such a case a resident defendant is joined with the nonresident, the joinder, even although fair upon its face, may be shown by a petition for removal to be only a fraudulent device to prevent a removal; but the showing must consist of a statement of facts rightly engendering that conclusion. Merely to traverse the allegations upon which the liability of the resident defendant is rested, or to apply the epithet 'fraudulent' to the joinder, will not suffice; the showing must be such as compels the conclusion that the joinder is without right and made in bad faith."

"The word 'fraud' used in this sense is not used in its popular or ordinary meaning, but signifies the result of plaintiff's, either intentionally or otherwise, joining as party defendant one who cannot under the evidence submitted be jointly liable." Scherrer v. Foster et al. (D. C.) 5 F.(2d) 236, 238.

These allegations of fact are relied on to justify the conclusion that Talley was joined herein in bad faith, in fraud of petitioner's rights, and with the sole purpose of preventing a second removal. Stripped of conclusions, we will take up the allegations of fact relied on in the petition for removal. We find that a previous suit for the same cause, in which Talley was not made a party defendant, was brought in the District Court of Bossier parish and removed, as alleged; and that in that case no negligence was alleged on the part of Talley. In the present suit we find that Talley is charged with, " * * * at or about the time he drove his car into the said intersection he fully observed, or should have observed, the approaching Chevrolet truck proceeding towards him and the intersection at an unlawful rate of speed, the driver of the said truck showing or making no apparent intention of stopping his truck at the intersection or observing the intersectional traffic signal; and that regardless of these facts and observations by the said Talley he continued to proceed across the intersection in the face of the oncoming truck and consequent impending danger and injury to your petitioner without applying his brakes or making any effort to stop when it was within his power and control to bring his car to a dead stop and when he should have stopped."

This is certainly an allegation of negligence and a statement of a cause of action against Talley. While it is true that in the

original suit no negligence on the part of Talley is charged, it is equally true that in it there is nothing inconsistent with the above allegations, the first petition being, as to them, wholly silent.

■ Under the rule of pleading, the allegation of insolvency must be taken as true, but it alone is not sufficient to establish a fraudulent intent. It is an element to be considered on the question of motive.

■ Responsibility for an accident is a mere legal conclusion. A party to a collision is not bound by a statement that he does not hold the other responsible.

The motion to dismiss the first case, filed in the federal court, but follows out the course pursued by bringing the second suit.

■■ We have no difficulty whatever in finding from the facts alleged and the history of the two cases that the motive in joining Talley, a resident, as a party in the second suit was to prevent its removal. But this does not suffice. The motive of the plaintiff taken by itself does not affect the right to remove. If there is a joint liability, he has an absolute right to enforce it as to all joint defendants, whatever the reason that moves him to assert the right. The fact that one is rich and one poor does not affect the case. Chicago R. I. & P. R. Co. v. Schwyhart, 227 U. S. 184, 33 S. Ct. 250, 57 L. Ed. 473.

There can be no fraudulent joinder where the plaintiff has a legal right to bring a joint action. In determining this question, the law looks to the case made in the pleadings. Chicago B. & Q. Ry. Co. v. Willard, 220 U. S. 413, 31 S. Ct. 460, 55 L. Ed. 521; Illinois Central Ry. Co. v. Sheegog, 215 U. S. 308, 30 S. Ct. 101, 54 L. Ed. 208.

■ Where a third person is injured by the collision of two automobiles, it is usual and prudent, where any possible ground for it exists, to make both drivers, or their principals, parties defendant. The fact of liability is only determined in a trial of the case. The failure to recover as to one such party does not establish fraud in joining him as a defendant.

■ So, in this case we find that, whatever plaintiff's motive may have been, he had the legal right, on the face of the pleadings, to make Talley a party defendant; that he was not a sham defendant; and that therefore his action in so doing was not fraudulent or in bad faith as defined in the decisions having to do with the removal of causes. We there-

fore find that the trial judge was within his jurisdictional rights, and correct, in refusing the motion for removal. Mecom v. Fitzsimmons Drilling Co., 284 U. S. 183, 52 S. Ct. 84, 76 L. Ed. 233.

Defendants Zorn and the Maryland Casualty Company also filed pleas to the jurisdiction ratione personæ and materiæ, upon the ground that the filing of the petition for removal divested the state court of jurisdiction. These pleas are disposed of by the ruling on the application for removal.

The Maryland Casualty Company filed an exception to the jurisdiction based upon the contention that it is made a party defendant under the provisions of Act No. 253 of 1918 and Act No. 55 of 1930, which it claims have no application to a policy of insurance not written in the state of Louisiana, and that if it is held said acts do apply in such instance, they are unconstitutional and violative of the Fourteenth Amendment of the Constitution of the United States and the "contract impairment" clause and the "full faith and credit" clause of said Constitution (article 4, § 1).

Subsequently, the same defendant filed a plea of misjoinder based upon the allegation that the contract of insurance between it and Zorn was entered into either in Florida or Alabama; that under the laws of neither of these states can an insurer be joined in an action against the insured except in certain cases, of which this is not one; that the policy itself also so provides.

Plaintiff appeals from a judgment sustaining these pleas and dismissing the suit as to the insurer.

The policy of insurance was entered into in the state of Alabama, the place of residence of the insured. It is proven that under the laws of that state the insurer cannot be joined against its will in an action against the insured. The policy itself provides: "No action shall lie against the Company to recover upon any claim or for any loss under insuring agreement unless brought after the amount of such claim or loss shall have been fixed and rendered certain either by final judgment against the assured after the trial of the issue or by agreement between the parties with the written consent of the Company. * * *"

Act No. 55 of 1930 provides in part: "Provided further that the injured person or his or her heirs, at their option, shall have a right of direct action against the insurer company within the terms, and limits of the policy, in the parish where the accident or injury oc-

curred, or in the parish where the assured has his domicile, and said action may be brought either against the insurer company alone or against both the assured and the insurer company, jointly and in solido." Section 2.

In the present case the suit is brought in the parish where the accident occurred, neither Zorn nor the company insuring him being residents of this state.

Article 13 of our Code of Practice provides that contracts are governed by the law of the place where they are entered into, but that the forms, the effects, and the prescription of actions are governed by the laws of the place where they are brought.

The policy covers "accidents occurring within the continental limits of the United States or Canada, caused by or resulting from the ownership, maintenance or operation of the named assured of the automobile or automobiles listed in the statements."

■ Counsel for plaintiff contend first that, since the contract contemplated the operation of the insured vehicle in any state of the Union, it is a contract made in one state to be performed in another and therefore to be governed by the law of the place of performance, in this case the place of the occurrence of the accident. The fallacy of this argument is that the contract is one of insurance, the only obligation being to indemnify the insured, within the terms of the policy, for any sums for which said insured is found liable after due trial or by agreement as provided. There is no obligation to come into court and defend the suit for the insured, hence there is no performance on the part of the insurer contemplated in any other state than that in which the contract was entered into. The fact that the accident occurs in some other state calls for no action on the part of the insurer in that state and therefore does not subject it or its contract to the laws of that state.

■ Plaintiff also contends that Act No. 55 of 1930 affects only the remedy or procedure. In so far as in a proper case the act permits the party injured to join the insurer, the statute is merely remedial. Rossville Comm. Alcohol Corp. v. Dennis Sheen Transfer Co., 18 La. App. 725, 138 So. 183; Hudson v. Georgia Casualty Co. (D. C.) 57 F.(2d) 757.

But if it is construed to give extraterritorial effect to the jurisdiction of the courts, it becomes more than remedial. We cannot so construe it.

The Hudson Case, supra, affords plaintiff no comfort, as in that case the contract of insurance was entered into in Louisiana and

was for that reason held subject to our laws, the accident happening in Arkansas. The fact that the tort occurred within the state of Louisiana undoubtedly confers jurisdiction upon our courts as to the tort-feasor, but it does not confer such jurisdiction over contracts between the tort-feasor and third persons entered into outside of the state.

It is persuasive that Act No. 184 of 1932, providing for the service of civil process upon nonresidents in cases arising out of the operation of motor vehicles within the state of Louisiana, is significantly silent as to service upon an insurer.

 ██ In Coderre v. Travelers' Ins. Co., 48 R. I. 152, 136 A. 305, 54 A. L. R. 512, a Rhode Island case, it is held that a Rhode Island statute, similar to our act of 1932, does not authorize suit against an insurer based on a policy written in Massachusetts, issued to a citizen of Massachusetts, where the accident occurred in Massachusetts. While the facts are different from those in the present case, the holding is pertinent that the Legislature cannot regulate contracts of a foreign corporation made in another state with a citizen of such other state, and that the rule that contracts are construed according to the law of the place of making applies to contract of insurance.

The case of Riding v. Travelers' Ins. Co., 48 R. I. 433, 138 A. 186, also a Rhode Island case, is squarely in point, the facts being identical with those under consideration and the holding directly opposed to the contention of plaintiff.

We therefore conclude that the judgment of the lower court sustaining the plea of misjoinder and to the jurisdiction entered by the Maryland Casualty Company, and dismissing the suit as to it, was correct.

Plaintiff, in the original petition, alleges that he and his two minor sons were paying passengers in defendant's truck and that defendant owed them the duty of safe and proper transportation.

The policy contains the stipulation: "No automobile covered hereby is or will be rented to others or used to carry passengers for a consideration express or implied."

After bringing the suit, upon being furnished with the policy containing the above stipulation, plaintiff filed an amended petition setting out that the above allegations as to paying passengers were made in error and that in fact he and his sons were guests.

Counsel, which, up to this time, were appearing for both Zorn and his insurer, on behalf of Zorn moved to strike out the averments of the amended petition on the ground that it is composed of statements of fact contradictory of and inconsistent with those contained in the original petition. This motion was sustained, whereupon same counsel filed an answer for Zorn, ignoring the allegations ordered stricken out.

Afterward, Zorn employed his own individual counsel, who filed for him an amended answer wherein the allegation contained in the original petition, that petitioner and his sons were paying passengers, is specifically denied and the affirmative averment made that:

"The said plaintiff and his said two sons were not riding or being transported in the said truck as paying passengers for the reason that neither the plaintiff nor either of his sons made any payment or made any arrangement to pay your respondent any fare or compensation whatsoever for their riding or being transported in the said truck and that the paragraphs hereinabove set forth as contained in his original answer, should be revised, supplemented and amended accordingly."

 If this is not a waiver of the order striking out the amended petition, it submits the identical issue tendered therein and renders the correctness of the ruling of the lower court on the motion to strike out purely moot. While, of course, it would be to the advantage of the insurance company to have this order maintained, as it would thereby escape liability. it has been eliminated from the case and cannot, without permission, espouse the cause of the remaining defendants Its counsel have been expressly deprived of authority to represent the insured in so far as his interest conflicts with theirs. It is patently to his interest to maintain the responsibility of his insurer for any judgment rendered against him.

On the merits, though attempted, no negligence is proven as to Talley. Zorn denies negligence on the part of his driver and affirmatively avers that if plaintiff or his sons were on his truck, it was without his knowledge and in violation of his express instructions and that any consent thereto by the driver was beyond the scope of his employment. In the alternative, he pleads contributory negligence in that plaintiff and his two sons were riding on the single seat of the truck (designed to accommodate only two persons) between the driver and the approaching car of Talley, and that one of the sons was sitting on his father's lap, so crowding the driver and obstructing his view as to ren-

der his operation of the truck unsafe and so prevented him from seeing the Talley car; that the father was negligent in that he assumed complete control of the expedition but failed to warn the driver of the approach of the Talley car, which he saw or should have seen.

In December, 1933, C. C. Lowery, a small farmer living at Hacada, Ala., decided to move to a location about three miles south of Mansfield, in DeSoto parish, La. He entered into negotiations with J. J. Zorn, of Floralla, Ala., engaged in the warehouse and trucking business, to transport his family and household goods. Zorn's offer to do this for $95 was rejected, a final agreement being reached at a price of $75; Zorn says to move the household goods alone; Lowery says to carry the household goods and himself and his 16 year old son Julius. On December 18, the goods were loaded and the truck driven by E. P. Williams, Zorn's employee, left Hacada, Ala., with Lowery and his son riding on the truck with Williams. They drove into Floralla where Williams stopped to get his expense money from his employer, and where Zorn admits he saw the Lowerys riding with his driver. He claims that he had instructed the employee to permit no one to ride with him unless they had written permission. Though Zorn admits that he knew the truck was starting on its journey with the Lowerys on it, he made no protest, claiming that he did not understand that they intended to make the trip on his truck.

■ The driver says that he permitted plaintiff and his son to ride, thinking the family car would overtake them and presumably relieve him of his passengers. This car, a Chevrolet sedan, carrying seven persons, did not start until two days later and could not overtake the truck. We are satisfied from the testimony that if Zorn did not expressly agree that Lowery and his son should ride the truck, he plainly saw that they were doing so and could draw no other reasonable inference but that they intended to continue, and that, not protesting, he at least impliedly consented thereto.

■ A second son, Quinton, aged 20, was staying with an uncle in Bossier City, a town across Red river from Shreveport. When the truck, at about 7:30 on the evening of December 20, reached this place, it picked up Quinton, who was to show the way to the new home, and continued on toward the Texas Street bridge, across Red river. The truck had only one seat, which was inclosed by a cab. Williams sat on the left, Quinton in

the middle, and Lowery on the right with Julius on his lap. Just before reaching the bridge, the street along which they were traveling, which is a continuation of Texas street called Hunter, is crossed by Traffic street. This intersection is guarded by a traffic light with the usual alternation of the colors green, amber, and red. By ordinance, vehicles are limited to a speed of 23 miles per hour and required to enter the intersection only on the green light, and to stop on the amber and the red. The testimony satisfies us that as the truck approached the intersection it was confronted with the red light, which Williams ignored and drove on without stopping at the white line. At about the center of the intersection the truck collided violently with a Buick sedan coming on Traffic street from the right and being driven by W. C. Talley. Four of the seven occupants of the Buick car, all that testify, say that it entered the intersection on the green light which shifted to amber just as the collision occurred. Talley says that he saw the truck coming but expected it to stop at the white line as the red light was against it. Neither car was exceeding the speed limit. There is some conflict as to which car ran into the other, but we do not think this issue important under the circumstances of this case. If the intersection had not been governed by the traffic lights, it would be of moment. The Lowerys say they did not see the light and did not notice the Buick until the instant of impact.

■■ Williams testifies that he was making 8 or 10 miles per hour; that as he approached the intersection the red light was showing, but that when he got within 10 or 15 feet of the white line the light shifted from red to green, so he continued on, to collide with the Buick almost directly under the light. As a matter of fact, this could not be, as the light is so arranged that between every change of the red and green an amber light is shown. It is no more permissible to enter on the yellow than on the red light. He admits that he did not see the Buick approaching from the right. He says that his view in that direction was obstructed by the boy sitting on his father's lap. This would present a serious question in view of defendant's plea of contributory negligence if it were not robbed of all force by the following:

"Q. As a matter of fact, Mr. Williams, you did not look to the right, saw the green light and went on? A. Yes, sir.

"Q. You did not attempt to look to the right? A. No, sir.

"Q. Didn't think it was necessary to look to the right? A. Well, I did not think it was."

Negligence, to be contributory, must be a proximate cause of the accident. As the driver did not look, the obstruction could not have influenced his actions. Though Williams complains of the crowding, he does not say that it in any way caused the collision. Counsel for defendant argue that Lowery should have kept a lookout to the right, should have seen the Buick and warned Williams. We do not think it the duty of a guest in an automobile to keep a lookout for cars at an intersection protected by lights.

██Plaintiff prays for damages to himself in the sum of $24,175; for Quinton Lowery, $1,500; and $750 for Julius. In the lower court there was judgment rejecting the demands as to Talley, and in favor of plaintiff and against J. J. Zorn for $150 for the use and benefit of Julius Lowery, and for plaintiff, individually, in the sum of $5,858.25, made up of $5,000 for loss of earnings, $500 for pain and suffering, and $358.25 for hospital and medical bills. The demand as to Quinton Lowery was properly rejected on the ground that, having boarded the truck at Bossier City, his presence on it was necessarily without the knowledge of Zorn and, as shown by the testimony, against his instructions. Quinton, as to Zorn, was a trespasser to whom was owed no other duty than not to wantonly injure him. Jefferson v. King, 12 La. App. 249, 124 So. 589.

Lowery, himself, and on behalf of his minor sons, has appealed from the judgment sustaining the plea of misjoinder and to the jurisdiction and dismissing the suit as to the Maryland Casualty Company. Zorn appeals generally. Plaintiff has answered this appeal, praying that the judgment as to him, individually, be increased to $15,000; as to Julius Lowery to $750; and that it be amended by awarding $1,500 for Quinton Lowery, and by reversing the ruling of the lower court striking out his amended petition.

For the reasons herein stated, we find the judgment sustaining the plea of misjoinder and to the jurisdiction, filed by the Maryland Casualty Company, and dismissing the suit as to it, correct. We also find that the lower court correctly refused the application for removal to the federal court. We find further that it was also correct in rejecting the demand as to Quinton Lowery; and that the ruling on the motion to strike out has become a moot question owing to the

pleading in the amended answer and the admission of testimony unobjected to thereunder. This leaves only the question of the quantum of damages as to plaintiff, C. C. Lowery, individually, and for the use and benefit of Julius Lowery.

██ Julius Lowery suffered a cut on the hand requiring six stitches to close, and a slight bruise on the head. He suffered from his injuries for a period of two weeks. The sum of $150 allowed him is reasonable.

Christopher C. Lowery was thrown violently from the cab of the truck to the pavement and severely injured about the head. The X-ray reveals a fractured skull. He was picked up unconscious and confined in a sanitarium for twenty-five days. During the first two weeks, he was out of his head and required attendants to hold him in bed. After leaving the hospital, he remained in bed at the Reeves home for about thirty days. He has been unable to do any work since, has lost from fifteen to twenty pounds in weight, sleeps fitfully, and has a poor appetite. He suffers from constant pains in the back and head, and dizziness, which make it difficult for him to walk over rough ground.

Dr. A. A. Herold, who treated him over a period of about thirty-five days, testifies that an examination of the spinal fluid showed a contusion or laceration of the brain. He finds that it is probable that the patient will be affected in the way of diminished functions with the further probability of developing epileptic spells.

Dr. J. D. Young, an expert on nervous and mental diseases, first examined plaintiff on January 26, 1934, and had treated him once a week up to the time of trial June 18, 1934. He testifies that Lowery is suffering from traumatic organic psychosis or inflammation of the brain; that this condition is not only permanent, but liable to result in epilepsy; that he is totally unable to work, his mentality, memory, sight, speech, and gait being affected. The weekly treatments must be continued indefinitely.

The defendant offered no medical testimony.

██ We conclude, as did the trial judge, that plaintiff is permanently totally disabled. He is a tenant farmer, forty-six years old, with a wife and family. He is not able to show that his work has yielded much in the way of financial returns. It has at least provided a living for himself and family. Loss of earning capacity in a farmer cannot be accurately computed in dollars and cents. The learned trial judge allowed $500 for pain and

suffering, which is reasonable, and $358.25 for medical expenses, which is also reasonable considering the testimony of Dr. Young that treatments would have to be continued. The allowance of $5,000 is figured out on the basis of an earning capacity of $400 per year. We do not think the allowance of damages for permanent disability and mental affection should be confined to this one element. We think it should be increased by $2,500. Simpson v. Hyde (La. App.) 147 So. 759.

For the reasons assigned, the judgment appealed from is amended by increasing the amount of damages allowed C. C. Lowery from $5,858.25 to $8,358.25, and, as amended, is affirmed.